## Erie City *v.* Baldwin, Appellant.

Argued April 13, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Clarence T. Bryan,* with him *Elmer L. Evans, Paul B. Joslin* and *James P. Bryan,* for appellant.

*Henry R. Jeffs,* Assistant City Solicitor, with him *Edward M. Murphy,* City Solicitor, for appellee.

OPINION BY CUNNINGHAM, J., July 13, 1939:

The history of this case need not be recited at length. The only question now involved is whether G. Daniel Baldwin, defendant below and appellant herein, was,

under the uncontroverted documentary and oral evidence adduced at the trial, the "owner of a market house" during the year 1934 in the City of Erie, within the meaning of Section 3, Par. 4, of Art. V of the Third Class City Act of June 27, 1913, P. L. 568, 580, as amended by the Act of May 27, 1919, P. L. 310, 315, and an ordinance of that city, enacted May 6, 1930, pursuant thereto. If he was, the judgment entered upon a verdict directed in favor of the city in its suit for a license tax of $100 for that year must be affirmed, otherwise, appellant's motion for judgment in his favor, notwithstanding the verdict, should have been granted. The interpretation of the statute and ordinance and their application to the undisputed facts of record raise pure questions of law.

The above cited statutory enactments, which were not materially modified by Section 2601 of the later codifying Act of June 23, 1931, P. L. 932, and its amendments, 53 PS §12198-2601, provided:

"Every city of the third class in its corporate capacity is authorized and empowered to enact ordinances......

"To levy and collect a license tax, not exceeding one hundred dollars each, annually, on all......markethouse companies and owners of market houses......"

Pursuant to this authority the city on May 6, 1930, enacted an ordinance, entitled, "An ordinance providing for the levying and collection of a license tax for general revenue purposes on market house companies and owners of market houses."

The provision of the ordinance now pertinent reads: "Section 1. That a license tax in the sum of $100 be, and the same is hereby levied upon all market house companies and the owners of market houses doing business in the City of Erie, Pennsylvania, which tax shall be payable annually on or before the first Monday in May of each year."

In the latter part of 1933 appellant became the sole owner of a property on the northwest corner of 16th

and State Streets in the City of Erie, and, pursuant to the provisions of the Act of June 28, 1917, P. L. 645, as amended by the Act of June 29, 1923, P. L. 979, 54 PS §21, (prohibiting the carrying on of any business under an assumed or fictitious name, style or designation, without having filed the certificates therein required), duly filed a certificate that he was carrying on and conducting a business at that location under the fictitious name of "Central Market Company," the character of the business being a "Public Market House."

The constitutionality of the ordinance was attacked by an original and supplemental affidavit of defense in lieu of a demurrer to the city's statement of claim, but its constitutionality was sustained in convincing opinions by Judge ROSSITER, the late president judge of the court below, and leave granted to file an affidavit of defense upon the merits. None of the issues decided against appellant in those opinions is included under appellant's statement of the question involved upon this appeal.

The defense set up under the heading "New Matter" was, in effect, that appellant's business at 16th and State Streets was not that of owning and conducting a market house, within the meaning of the statute and ordinance, but was "the renting of stores." The city's reply was that the character of the business there carried on was, in fact, that described by him in his certificate as a "Public Market House."

When the case came on for trial before Judge HIRT, then president judge of the court below and now a member of this court, and a jury, it was disposed of as above stated and this appeal followed.

The evidence for the city consisted of formal proof of the ordinance and registration certificate, the testimony of two patrons of Central Market, and that of appellant when called as for cross-examination. One patron stated she had been in "Central Market House" many times and, after having described it as a "very

nice market," was asked where she "bought her produce in there." Excerpts from her testimony read: "A. Well, all around different stalls. I don't confine my buying to any one stall. Q. Various stalls? A. Various stalls. Q. What do they sell there? A. Vegetables and meats, flowers, and most anything you want to buy ...... Q. As a matter of fact, nearly everything is sold in those buildings? A. Yes. Q. You can buy food, and what else can you buy in both of those places? A. Almost anything you want to buy."

The other patron testified: "Q. What is the nature of the business of the market house? A. Why they sell vegetables and lease stalls to different people, and they sell pretty near everything in the grocery and vegetable line."

A companion case, involving another property known as "Twelfth Street Market," was on trial along with the present one. Appellant when called for cross-examination by counsel for the city was examined as to both locations. Material portions of his testimony read: "Q. Who does most of the business for the Central Market? A. The manager. Q. Who employed him? A. I did ...... Q. As I understand it, both markets are conducted by subleasing to various owners of stalls, who in turn sell to the public under one roof? A. A good deal of business is done out of doors, in the back of the lot. Q. You not only do business under the one roof, but you do business on the sidewalk? A. No, we do business on the property in the rear end in the vacant lot. Q. You advertised both of these places as market houses, I believe? A. Advertised them as markets. Q. You advertised the Twelfth Street Market? A. Yes. Q. And you advertised Central Market House? A. Not house, but market. Q. Central Market? A. Yes. Q. And you have a market master in each particular place? A. We have a manager."

Testifying in his own behalf, appellant said both markets were "divided into stores, rented to tenants."

When asked whether he "knew how many stores there are in the Central Market," he replied, "I do not, a good many."

Although appellant had stated in his registration certificate that the "character of the business" carried on by him under the fictitious name of Central Market Company is: "Public Market House," he seems to have reached the conclusion by the time of trial that the use of that phrase as descriptive of his business had, in the light of the language of the statute and ordinance, been most unfortunate. His studied effort to divorce "house" from "market" is apparent in this portion of his cross-examination: "Q. In addition to renting these stalls, assuming what you say to be true, you also furnish light and heat and refrigeration and you clean the premises and keep them in shipshape condition, is that correct? A. Yes. Q. You provide a centralized place of business, by various small lessees to there sell to the public fresh vegetables, and constituting what is ordinarily called a public market? A. I wouldn't say it is a public market. It is owned by individuals. Q. It is a market house? A. No, I wouldn't say it is a market house. It is a market. We never termed it as a market house; always termed it as a market and so advertised it. Q. You wouldn't call it a market house? A. Call it market barn, or market store, or anything else. Q. It is a market, though, isn't it? A. It is called the market, sure."

We think the testimony to which we have referred demonstrates that appellant was, during 1934, carrying on a market business, i. e., a large building where vegetables, meats, produce, and other commodities intended for human consumption, were sold by divers persons from numerous spaces or stalls, but all under the supervision of a manager answerable to him: Webster's New International Dictionary (2d ed. 1935). Such a business is readily distinguishable from that of the owner of a building who leases separate storerooms therein

to various tenants, each of whom conducts a separate and independent business.

A "market" may be established on ground or in a building belonging to a municipality and conducted under the direct supervision of municipal officers, or on ground or in a building belonging to an individual or a private corporation, but subject to the police control and visitorial power of the municipality. The business of conducting a market differs in many particulars from the operation of separate stores, each complete in itself, although the latter may all be under the same roof or within a single large building.

By clause 30 of section 3 of Art. V. of the Act of 1913, supra, at page 587, cities of the third class are authorized, inter alia, "to purchase and own ground for, and to erect and establish, market houses and market places." By the amendment of 1919, supra, at page 321, this provision was enlarged to include milk depots, and the municipalities were empowered to maintain, as well as erect and establish, market houses and milk depots and to provide and enforce suitable general market regulations. Although this was the state of the law at the date of the passage of the ordinance, the City of Erie, as we understand the record, had not erected such market houses, nor had it expressly authorized appellant to establish and operate the market here in question as a public market. The absence of such express authorization or designation is seized upon by counsel for appellant as a legal defense to the suit of the city. The principal ground upon which it asked for binding instructions and upon which it based its motion for judgment n. o. v., was that, as the building in question had not been "designated by the municipal authorities of the City of Erie for the sale of articles necessary or convenient for the subsistence of men and domestic animals," there could be no recovery in this action.

The case of *Strickland v. Penna. R. R.*, 154 Pa. 348, 26 A. 431, is cited as authority for the above proposi-

tion, but we are not convinced it is in any way decisive of the present issue. The question there involved did not relate to the power and authority of municipalities to impose and collect a license tax from market house companies or owners of market houses, nor to what constitutes a market. The market house there in question was owned and operated by a market company at 17th and Market Streets in the City of Philadelphia, with the permission and under the supervision of the municipality. Strickland, the plaintiff in the case, was a lessee in possession of certain stalls in the market house when the defendant railroad company, in the exercise of its right of eminent domain, took possession of the property and gave a bond to the market company to secure compensation to it as the owner of the market house. No security was given or tendered to the plaintiff. On appeal by Strickland from a judgment in favor of the railroad company, upon a demurrer, Mr. Justice WILLIAMS began the opinion written by him for the Supreme Court with the interrogation: "What estate or interest has the lessee of a stall in a market house?"

The conclusion reached was that he did not have such an exclusive right to the possession of his stall as he would have had to a store or a dwelling house; that he had no right to the ground covered by it, as ground, and no estate in the building that would have enabled him to recover his stall by an action of ejectment, if wrongly dispossessed; and that he could not sustain his action against the railroad company.

In the course of the discussion, it was pointed out that the public sale of articles of food has been the subject of police regulation and control from the early days of the common law and that the right "to conduct such sales, or to open a place where sales might be conducted by others, was treated in England as a franchise held under the king, to be supported by express grant, or by prescription." After remarking that such rights are derived in this country from the municipality within

the limits of which the market is kept, the writer of the opinion said: "In this state a market may be defined with practical accuracy as a place designated by the municipal authorities of a city or an incorporated town for the sale of articles necessary or convenient for the subsistence of men and domestic animals." It is upon this incidental remark that appellant's whole argument is based.

There can be no doubt that the granting of a franchise to conduct a market was one of the "Perogatives of the Crown" and that unless a "concourse of buyers and sellers" was held under an express grant or by prescription, such a gathering was not technically a "market" within the old common law definition: Halsbury's Laws of England, (2d ed. 1936), Volume 22, page 44, Section 58: 1 Words & Phrases, Volume 5, page 4381 (1904). It is also true that in Pennsylvania the proper municipality may grant or refuse the privilege of conducting a public market, but permission to engage in the business which appellant certified he was conducting may be implied from the failure of the municipal officers charged with the duty of exercising its police powers to take any action looking toward its suppression.

The business which the uncontroverted evidence shows appellant was carrying on had all the characteristics of a common law public market. The owner of such a business cannot escape the taxation expressly authorized by the statute to be imposed upon him, any more than he can evade municipal regulation and control, merely because he neglected to obtain express municipal consent at the time it was originally set up.

We have no difficulty in concluding, as did the trial judge, that appellant was the "owner of a market house," within the intendment of the statute and the ordinance. Under the evidence upon this record, he is not in a position to set up his failure to obtain municipal approval of his enterprise as a defense against the

collection of the license tax for which the judgment appealed from was entered.

Judgment affirmed.

HIRT, J., took no part in the consideration or disposition of this appeal.